IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

NORTHERN DIVISION

UNITED STATES OF AMERICA

v.  CRIMINAL NO. 3:19—cr-128-DCB-LRA

BRETT K. HICKMAN  DEFENDANT

ORDER

Before the Court is Defendant Brett K. Hickman ("Hickman")'s Motion to Suppress. [ECF No. 25]. The Court held a hearing on the Motion on July 14, 2020 and it is now ripe for review. Having heard from the parties, considered the motion, applicable statutory and case law, and being otherwise fully informed in the premises, the Court finds as follows:

Background

Hickman was indicted by a federal Grand Jury on July 24, 2019 and charged with one count of violating 18 U.S.C. § 1111, First Degree Murder and one count of violating 18 U.S.C. § 2241(c), Aggravated Sexual Abuse. The instant Motion to Suppress [ECF No. 25] asserts that Hickman made a series of involuntary statements during questioning on June 8, June 13, and June 19, 2019.

On June 8, 2019, Neshoba County 911 dispatch received a call that a 2-year-old female (K.F.) was barely breathing and cold to the touch. The caller claimed that the child was taking

1

a bath with her sister. Neshoba County 911 dispatch contacted Choctaw Police and Emergency Services Personnel ("EMS") who sent officers and an ambulance to the scene. EMS found Hickman with the unresponsive child. EMS noted that the child was in dry clothes. Hickman was the live-in-boyfriend of the child's mother, Gwendolyn Frazier ("Frazier"). EMS transported K.F. to Neshoba General Hospital in Philadelphia, Mississippi. Hickman also went to the hospital.

The responding Choctaw Police Officer observed bruising to the child's facial area. Medical staff informed the officer that K.F. had multiple bruises on the facial area, what looked like a burn mark on her leg, and vaginal tearing. The officer requested that an investigator be notified of the situation.

Choctaw Police Department Investigator, Gabriel Billie ("Billie"), responded to the hospital, took photos of the deceased child, and collected various items of evidence. Billie spoke with Hickman briefly at the hospital and asked if he would be willing to come to the police station to talk about what happened. Hickman did not have a means of transportation. Billie asked if Hickman would be willing to ride with an officer to Choctaw Justice Complex. Billie advised Hickman that he was not under arrest and that he merely wanted to talk with Hickman

about what happened to the child. Hickman agreed to ride with the officer and was not handcuffed or restrained in any way.

In the subsequent investigation, officers interviewed Hickman on three separate occasions: June 8, June 13, and June 19, 2019. In each interview, Hickman was apprised of his rights. Hickman was always permitted to leave, was never handcuffed, and was informed – on each occasion – that he was not under arrest. Hickman was arrested on August 1, 2019. Once in custody, Billie attempted to interview Hickman, but Hickman refused and invoked his right to an attorney.

The Government asserts that Hickman was not in custody for Miranda purposes until he was arrested. Hickman claims that he was in custody for all three interviews and that his statements from those interviews should be suppressed.

## Discussion

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court determined that "the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney." Edwards v. Arizona, 451 U.S. 477, 481-82 (1981). "[I]f the accused indicates in any manner that he wishes to remain silent or to consult an

3

attorney, interrogation must cease, and any statement obtained from him during interrogation thereafter may not be admitted against him at his trial." Fare v. Michael C., 442 U.S. 707, 709 (1979) (citing Miranda, 384 U.S. at 444–45). Not only must the interrogation cease, but law enforcement also may not re-approach the suspect for further questioning until a lawyer has been made available. See Edwards, 451 U.S. at 484 ("[A]n accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.")

However, the interests protected by Miranda warnings only apply to custodial interrogation. United States v. Wright, 777 F.3d 769, 774 (5th Cir. 2015). A suspect is "in custody" for the purposes of Miranda "when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." Id. at 596. "Two discrete inquiries are essential to the determination: First, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." United

States v. Cavazos, 668 F.3d 190, 193 (5th Cir. 2012) (quoting J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011)).

"The requisite restraint on freedom is greater than that required in the Fourth Amendment seizure context." Wright, 777 F.3d at 774(citing United States v. Bengivenga, 845 F.2d 593, 598 (5th Cir. 1988)). "Whether a suspect is 'in custody' is an objective inquiry that depends on the 'totality of the circumstances.'" United States v. Ortiz, 781 F.3d 221, 229 (5th Cir. 2015) (quoting Wright, 777 F.3d at 774–75).

The Fifth Circuit has identified factors relevant to the custody inquiry:

> (1) the length of the questioning; (2) the location of the questioning; (3) the accusatory, or non-accusatory nature of the questioning; (4) the amount of restraint on the individual's physical movement; and (5) statements made by officers regarding the individual's freedom to move or leave.

United States v. Romero–Medrano, 207 F.Supp.3d 708, 711–12 (S.D. Tex. 2016) (citing Wright, 777 F.3d at 775). No one factor is determinative. Wright, 777 F.3d at 775. In a motion to suppress, the defendant has the burden of proving he or she was under arrest or in custody. United States v. Webb, 755 F.2d 382, 390 (5th Cir. 1985) (citing United States v. Charles, 738 F.2d 686, 692 (5th Cir. 1984) (overruled on other grounds)). An individual's Fifth Amendment right against self-incrimination is only implicated during custodial interrogation. See Wright, 777

5

F.3 at 777. Furthermore, if an individual is not "in custody," a court need not reach the issue of whether the individual's reference to a lawyer was an "unambiguous or unequivocal request for counsel," as required in the suppression context. Id.

The Court will review the three interviews in question and consider the factors set out by the Fifth Circuit to determine whether Hickman was ever "in custody" prior to his arrest.

**The First Interview**

On June 8, 2019, Hickman agreed to ride with officers to the Choctaw Justice Complex. The purpose of the interview was to analyze the events leading to K.F.'s death. Billie and Special Agent Charles Morrow ("Morrow") of the Federal Bureau of Investigation ("FBI") met with Hickman and advised him of his rights. When advised that he had a right to talk to a lawyer, Hickman asked, "what does that mean?" Morrow responded by saying that Hickman had a right to have a lawyer present and that he could talk to the lawyer for advice and that the lawyer could be present during questioning. Billie explained that it was the police department's procedure to advise people of their rights. Morrow further advised Hickman that he was not under arrest and that he could stop the interview at any time.

Hickman initialed the Advice of Rights form at various places and signed the waiver indicating that he was willing to

6

talk with the police without a lawyer. The first interview was recorded. During this interview, Hickman made a statement indicating that K.F. received her injuries because of a fall in the bathtub while bathing. The interview began at approximately 11:45 p.m. and lasted approximately two and a half hours. Hickman did not have a ride home, so he stayed at the Justice Complex until Billie finished a subsequent interview – with the child's mother, Frazier – at approximately 4:00 a.m. the following morning. At the end of Frazier's interview, Billie asked Hickam to sign a Voluntary Consent to Search form for his house. [ECF No 34-5]. Billie then drove Hickman – who was seated in the front of the vehicle – back to Hickman's home.

The factors weigh against custody for the first interview. When looking at the totality of the circumstances, it is clear that Hickman was not in custody during his first interview. He agreed to ride with Officer Billie to the Choctaw Justice Complex, he was never handcuffed or restrained in any way, he was repeatedly told that he was not under arrest, that he was free to have an attorney present with him, and that he could stop the interview at any time. See Wright, 777 F.3d at 773, 776(finding that a defendant was not in custody when he was questioned without handcuffs and permitted the freedom to remove himself from police questioning).

A suspect who voluntarily accompanies police to the station to talk with them is not automatically deemed to be in custody. See Oregon v. Mathiason, 429 U.S. 492, 493 (1977) ("A suspect who voluntarily accompanies police to the station to talk with them is not automatically deemed to be in custody."). Also, if a defendant is told that he is not under arrest by an agent, it "weighs against a finding of custody." United States v. McNair, 444 Fed.Appx. 769, 770 (5th Cir. 2011); see also United States v. Howard, 991 F.2d 195, 200 (5th Cir. 1993); see also United States v. Wright, 777 F.3d 769, 775 (5th Cir. 2015).

Here, the duration of the interview weighs in favor of the Defendant. The total duration of the first interview was approximately two and a half hours. While there is no constitutional time limit that definitively triggers Miranda, "detention of a defendant for 'approximately an hour raises a considerable suspicion.'" United States v. Romero-Medrano, 207 F.Supp.3d 708, 711–12 (S.D. Tex. 2016)(citing United States v. Harrell, 894 F.2d 120, 124 n.1 (5th Cir. 1990)). However, a lengthy interrogation is not per se evidence that a defendant was in custody. See McNair, 444 Fed.Appx. at 770("[T]he fact that [the defendant's] interrogation lasted for almost two hours does not mean that the interrogation was per se custodial.") Duration should not "be examined alone to determine custody." United States v. Patterson, 393 F.Supp.3d 456, 473 (E.D. La.

2019). Furthermore, the Court is not persuaded that the fact the interview was conducted in the early hours of the morning is indicative of custody. Hickman's interview was logically done after law enforcement collected evidence at the hospital and satisfied other administrative and investigatory needs prior to any questioning. There is no evidence that law enforcement delayed its interrogation of Hickman. In contrast, the later interviews on June 13 and 19, 2019 occurred during the day time.

The Court finds that it is appropriate to consider why the interview lasted so long. Courts look to see if an interview consists of police officers hounding a defendant for hours "with variations of the same questions all pertaining to the same singular event." Id. at 468. Courts also look to see whether the questioning was "accusatory or non-accusatory," and whether the defendant was "confronted with evidence of guilt." Id.(citing Wright, 777 F.3d at 775).

The Court has reviewed Government's Exhibit G-2, the video of Hickman's June 8, 2019 interview. [ECF No. 34-2]. The law enforcement officers were interviewing Hickman about the death and possible sexual assault of a child, a complex issue that involves a certain depth of discussion to fully understand the events as transpired. At no point during the interview, did Agent Morrow or Officer Billie accuse Hickman of a crime. It is

9

clear upon review that this interview was conducted in a calm manner, was intended to gather information about the situation and the parties involved, and was not conducted in an accusatory manner.

A significant portion of the interview consisted of Hickman providing a statement about the events that had transpired earlier that day where he claims that K.F. drowned and describing his response to finding her. It involved gathering the separate familial histories of Hickman and Frasier, as well as their relationship as a couple. There is no evidence whatsoever of coercion or any other oppressive tactics which have been identified in other cases which have resulted in the suppression of evidence.

Accordingly, after reviewing the interview, and considering the fact that Hickman was told he could leave and stop the questioning at any point, that Hickman was informed he was not under arrest, he was not physically restrained, and considering other relevant factors, the Court finds that he was not in custody during his first interview. Inasmuch as the defendant was not in custody, the Court need not reach whether Hickman's question about having a lawyer was an "unambiguous or unequivocal request for counsel." Wright, 777 F.3d at 777.

**The Second and Third Interviews**

On June 13, 2019, Morrow and Billie reached out to Hickman and asked if he would be willing to discuss the case again. Hickman responded that he did not have a vehicle and agreed to ride with the officers to Choctaw Justice Complex. Again, Morrow and Billie reminded Hickman that he was not under arrest.

Upon arriving to the Choctaw Justice Complex, Special Agent George Odom ("Odom") asked Hickman if he would be willing to take a polygraph, to which he agreed. Odom wrote out three questions on a legal pad for Hickman to answer. (1) did you voluntarily agree to take a polygraph exam? (2) Did you come to this exam voluntarily? (3) Do you understand that you are free to go at any time?

Hickman proceeded to initial and answer each of these in writing. Odom then verbally advised Hickman of his Miranda rights and provided him with a copy of an Advice of Rights Form (FD-395). Hickman said that he understood his rights and indicated that he was willing to answer questions without a lawyer present. Hickman was also provided a Consent to Interview with Polygraph form (FD-328), to which he acknowledged that he understood and signed.

In his second interview, Hickman provided a written statement. He claimed that, on the day K.F. died, she was outside with him while he was working on a truck. [ECF No. 34-9]

11

at 2. The truck was on a jack and Hickman was under the truck working on the transmission. According to Hickman, K.F. was "laid down… underneath the front tire" and he did not notice that, when he was moving the transmission back and forth, the truck was slowly coming down. Id. at 2–3. As he described it, K.F. was crushed by the front tire and he quickly jacked the truck up to get her out. Then he sent her inside to take a bath. Id. at 3.

On June 19, 2019, Billie contacted Hickman at his place of employment, a local auto garage. Billie asked if he would be willing to come to the station to ask additional questions about the child. Hickman agreed, and Billie came to pick him up for the interview. Hickman rode in the front seat of the truck with no handcuffs.

At the Choctaw Justice Complex, Hickman met with Odom who asked if he would be willing to take another polygraph exam. Odom reassured Hickman that this polygraph was optional and that he would be free to leave at any time. Odom also told Hickman that he would be given a ride home if he wished to stop the interview. Hickman agreed to take the test and was once again asked questions regarding the voluntariness of the polygraph. Odom verbally advised Hickman of his Miranda rights and Hickman said that he understood. Odom then presented Hickman with the

consent for Interview with Polygraph form. Hickman told Odom that he understood everything on the form and agreed to sign it.

During the interview, Hickman told Odom that he had inserted his thumb in K.F.'s vagina by accident on June 8, 2019. After the polygraph, Hickman met with Morrow and Odom and told them that he began wrestling with K.F. after the accident with the truck. He told law enforcement that he jumped as high as he could and accidentally landed with his knee on K.F.'s stomach. Hickman told the agents that he picked her up in a choke slam that caused her head to hit the floor. Hickman provided a detailed written statement.

Hickman drank water throughout the third interview and took bathroom breaks as needed. At one point, Agent Odom took a break and provided Hickman with a sandwich and snacks. Hickman met with Agent Odom in one room and Hickman requested to move into the conference room to write out his statement. After meeting with the agents, Hickman was taken back home.

Hickman was not in custody in the second or third interview. The officers informed Hickman that he could leave at any point, he was not restrained in any way, he was read his Miranda rights, he was able to move freely – the interviewers acquiesced to Hickman's request to move to the conference room to write his statement.

As previously discussed, the duration of the interviews is not a dispositive factor and should be looked at in concert with the other factors of the interrogation. Additionally, the fact that Hickman was transported to the Justice Complex in a police vehicle is not indicative of custody because Hickman did not have another mode of transportation, he was never restrained in the vehicle, and, in fact, he typically sat in the front seat with the person giving him a ride. Hickman was also not in custody because he was the focus of the investigation. See Beckwith v. United States, 425 U.S. 341 (1976). (The Court rejected the notion that the "in custody" requirement was satisfied merely because the police interviewed a person who was the "focus" of a criminal investigation).

Here, law enforcement made it explicitly clear to Hickman at every interview that he was not under arrest, that he did not have to answer any questions if he did not want to, that he had a right to retained or appointed counsel, and that he was free to leave at any time. Accordingly, the Court finds that Hickman was not in custody. Therefore, the Court finds that the statements that Hickman voluntarily gave to law enforcement during the three interviews in question should not be suppressed.

**The Defendant's Waiver of his Rights under Miranda**

However, even if the Court had found that Hickam was in custody, his statements would not be suppressed because he was read his Miranda rights and waived them.

Before the Government may introduce a defendant's incriminating statement in its case in chief, it must prove a voluntary, knowing and intelligent waiver of the accused's Miranda rights. Miranda v. Arizona, 384 U.S. 436, 475 (1966); Moran v. Burbine, 475 U.S. 412 (1986). Whether a defendant has waived his rights under Miranda "present[s] a factual question for the district court." United States v. Collins, 40 F.3d95, 98-99 (5th Cir. 1994). In determining whether a waiver was valid, courts analyze the totality of the circumstances surrounding the interrogation. Moran v. Burbine, 475 U.S. 412, 421 (1986). See also United States v. Boche-Perez, 755 F.3d 327, 342-43 (5th Cir. 2014). (Court found a valid wavier based on totality of the circumstances where the interview lasted an hour, was conducted in a large room, officers came and went, and defendant received breaks).

The defense argues that Hickman did not voluntarily or knowingly waive his rights. The defense relies on the fact that Hickman asked what an attorney could do for him when he was read his Miranda rights before his first interview. However, officers do not have to explain substantive criminal law or the rules of

15

evidence to a suspect. See Harris v. Riddle, 551 F.2d 936, 938 (4th Cir. 1977). There is no burden on police beyond the administration of the warnings. See United States v. Guerra, No. SA-13-cr-274-QLG, 2013 WL 11740204, at *3 (W.D. Tex. Oct. 2, 2013). The duty is discharged when the warnings required by Miranda are fully and fairly given. Id.

Additionally, asking a question about one's right is not necessarily an invocation of the right. See Blakeney v. Bingham, No. 2:11-cv-75-KS-MTP, 2013 WL 4015009, at * (S.D. Miss. Aug. 6, 2013)(finding that the defendant saying "I don't know if I need a lawyer or not," "Do I have the right to stop talking?" and "I need to talk to somebody" did not constitute an unambiguous request for an attorney). In order to invoke the right to counsel during a custodial interrogation, the accused must make a statement that can be "reasonably construed to be an expression or desire for the assistance of an attorney." McNeil v. Wisconsin, 501 U.S. 171, 178 (1991). The invocation of the right to counsel cannot be "ambiguous or equivocal." Davis v. United States, 512 U.S. 452, 459 (1994). In other words, if a reasonable officer "in light of the circumstances would have understood only that the suspect might be invoking the right to counsel," law enforcement may continue questioning the suspect. See id.

In this case, Hickman never claimed that he wanted a lawyer. Instead, he merely asked what a lawyer could do for him if he had one with him. That is not an unambiguous or unequivocal invocation of the right to counsel, therefore, law enforcement had the authority to continue questioning him. Hickman was told on numerous occasions that he had the right to an attorney, but it was not until his arrest on August 1, 2019 that he invoked the right.

Accordingly,

IT IS HEREBY ORDERED that the Defendant's Motion to Suppress [ECF No. 25] is DENIED.

SO ORDERED this the 3rd day of August, 2020.

                                             ___/s/ David Bramlette_____
                                             UNITED STATES DISTRICT JUDGE